UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action Number
04-30081-MAP

NICHOLAS A.
by his Parents, Bruce and Laura A.
as Next Friends
*Plaintiff*

v.

BELCHERTOWN PUBLIC SCHOOLS
*Defendant*

COMPLAINT FOR JUDICIAL REVIEW AND FOR ATTORNEYS FEES

INTRODUCTION

1. This complaint is brought by Nicholas A., a special education student at the Belchertown Public Schools, to ask for additional educational services as well as for attorney's fees incurred in the hearing before the Bureau of Special Education Appeals in which he was the prevailing party.

JURISDICTION

2. Jurisdiction is conferred upon this Court pursuant to 20 USCA sec. 1415 and 28 USC sec. 1331. This Court has pendent jurisdiction over the state law claims in that the state and federal claims derive from the same facts.

1

## PARTIES

3. Nicholas A. is a fourteen year old student enrolled in the Belchertown Public Schools who resides in Belchertown, MA with his parents, Laura and Bruce A.

4. The Belchertown Public Schools (Belchertown) is a public school district and a department of the Town of Belchertown, MA with a principal place of business at 14 Maple Street, Belchertown, MA.

5. Belchertown is the local educational agency charged with providing a free appropriate public education to students with special needs, including Nicholas A., who reside in its jurisdiction.

## FACTS

6. Nicholas A. (Nicholas) is a student who is entitled to receive special education services pursuant to state and federal law. Nicholas suffers from specific learning disabilities in the areas of reading, math computation and written expression. He also has attention and organizational deficits.

7. In the spring of 2003, Belchertown offered an Individualized Education Plan (IEP) to Nicholas and his parents describing the special education and related services Belchertown proposed for Nicholas for the 2003-2004 school year.

8. Nicholas' parents rejected the IEP offered by Belchertown as inappropriate to meet his needs.

9. The Parents hired Attorney Carol Booth of Burres Fidnick Booth & Kaufman, LLP in Amherst, MA to represent them and Nicholas on issues related to Nicholas' special education needs. Belchertown was at all times relevant to this

2

complaint, represented by Attorney Regina Williams Tate of Murphy Hesse Toomey and Lehane, LLP in Quincy, MA.

10. The parents appealed the rejected IEP to the Bureau of Special Education Appeals. Hearing Officer Catherine Putney-Yaceshyn was assigned to the case and a Pre-Hearing Conference was scheduled.

11. After the Pre-Hearing Conference in September 2003, Belchertown offered one to one tutoring services to Nicholas after school for an hour a day, four days per week. Belchertown prepared a new IEP for Nicholas incorporating the tutoring services.

12. The parents rejected the IEP, but accepted all of the services offered in the IEP pending resolution of their dispute with the school about Nicholas' educational services. Nicholas therefore received the tutoring services beginning in October 2003.

13. The Parents requested a hearing before the Bureau of Special Educaiton Appeals to resolve the issue of appropriate educational services for Nicholas.

14. Belchertown's position was that its program as set forth in the September IEP met the federal and state standards and was appropriate for Nicholas.

15. The Parents' position was that the services offered by Belchertown were inadequate to provide Nicholas with a free appropriate public education and that the addition of tutoring services was insufficient. The parents specifically objected to the school's failure to provide coordination between the tutoring and the rest of the special education program provided for Nicholas and the lack of an

3

effective, comprehensive program for addressing Nicholas' organizational problems.

16. The Parents advocated for Nicholas to be placed at the White Oak School, a private day school providing services for learning disabled students where they believed Nicholas would be given the kind of comprehensive, coordinated program he needs.

17. A hearing was held over three days in February, 2004 before Hearing Officer Putney-Yaceshyn. The questions presented for the hearing were: 1.) Whether the IEP proposed by Belchertown is reasonably calculated to provide Nicholas with a free appropriate education in the least restrictive environment; 2.) If not, whether the IEP can be modified to provide Nicholas a free appropriate public education in the least restrictive environment; and 3.) If not, whether the White Oak School would provide Nicholas with a free appropriate public education in the least restrictive environment.

18. In an opinion dated March 18, 2004, received on March 29, 2004, the hearing officer found that the IEP proposed by Belchertown was not reasonably calculated to provide Nicholas with a free and appropriate public education in the least restrictive environment. She further found that the Belchertown program could be modified and that Nicholas did not require a placement at the White Oak School. A true copy of the hearing officer's decision is attached hereto as Attachment A.

19. The hearing officer ordered Belchertown to provide additional services to Nicholas, including direct instruction in the area of organizational skills.

4

Belchertown was ordered to consider whether Nicholas requires assistive technology to assist him in maintaining his homework organization, since that had been included in prior IEPs. She ordered consultations between the organizational skills instructor and Nicholas' other teachers so that the organizational skills he is taught directly can be reinforced in all of his classes. She further ordered that the Team add consultations between Nicholas' special education teacher and his one-to-one tutor to his IEP to insure coordination and consistency.

20. The Parents achieved some, although not all, of the relief they sought through the decision of the hearing officer.

21. The Parents are the prevailing party in the matter before the Bureau of Special Education Appeals.

22. The Parents incurred $17,200.00 (seventeen thousand two hundred dollars) in expenses for attorney's fees and costs for representation in the hearing before the Bureau of Special Education Appeals. A full description of these expenses is attached hereto as Attachment B.

23. Although the Hearing Officer ordered additional services for Nicholas, her decision is not supported by the evidence, is contrary to the law and is erroneous. The Hearing Officer failed to acknowledge and accord due weight to the evidence of the enormous substantive errors contained in the IEP, failed to acknowledge the evidence of Belchertown's repeated failures to provide services called for in the IEP and failed to acknowledge and accord due weight to the evidence that the

special education teacher was leaving her position shortly after the hearing and the impact of her departure on Nicholas' program.

24. The Hearing Officer failed to accord due weight to the evidence that Belchertown has been unable to follow through on the services it has already promised to provide for Nick. Ordering Belchertown to provide additional services in light of its inability to implement consistently the services it was already providing is an exercise in futility, and cannot result in a program in which Nicholas can successfully obtain a free appropriate public education.

25. After the Hearing Officer's order was issued, the special education teacher did leave her position for her maternity leave. Belchertown hired a music teacher who is not certified in special education as a replacement for Nicholas' primary special education teacher.

26. Belchertown's program, both as set forth in the IEP and as implemented by Belchertown, both prior to the Hearing Officer's decision and since her decision was issued fails to provide Nicholas with a free and appropriate public education.

27. The White Oak School is a private school approved by the Department of Education of the Commonwealth of Massachusetts to provide special education services to learning disabled students.

28. The White Oak School provides a comprehensive program of direct instruction and remediation for learning disabled students. Its program provides organizational instruction and assistance as well as instruction and assistance for reading, math computation and written instruction.

29. The White Oak School can provide Nicholas with a free appropriate public education, and is the least restrictive environment in which Nicholas can receive appropriate services.

## LEGAL CLAIMS

### Attorney's Fees:

30. The facts set forth in paragraphs 1-29 are hereby incorporated by reference.

31. Pursuant to 28 USC section 1415 the Parents are entitled to an award of their attorney's fees and costs incurred.

### Violation of 20 U.S.C. section 1401 et seq. and M.G.L. Ch. 71B

32. The facts set forth in paragraphs 1-29 are hereby incorporated by reference.

33. The Hearing Officer violated both state and federal law when she issued a decision that was erroneous, not based upon the evidence and was arbitrary and capricious.

## REQUESTED RELIEF

Wherefore the Parents request that this honorable Court grant them the following relief:

1. Reverse the decision of the Hearing Officer in part and order that Belchertown refer Nicholas to the White Oak School and fund his placement there.

2. Declare that the Nicholas A. and his parents are the prevailing parties in the matter before the Bureau of Special Education Appeals.

3. Award Nicholas A. and his parents their attorney's fees and costs in the amount of $17,200.00 (seventeen thousand two hundred dollars) for representation before the Bureau of Special Education Appeals.

4. Award Nicholas A. and his parents their attorney's fees and costs incurred for the filing and pursuit of this matter.

5. Such other and further relief as this Court deems necessary and proper.

                Respectfully Submitted
                Nicholas A. by his Parents
                By Their Attorney

                _____
                Carol Booth, Esq.
                BBO #049520
                Burres Fidnick Booth & Kaufman, LLP
                190 University Drive
                Amherst, MA 01002
                (413) 253-3900
                BBO # 049520

March 18, 2004

## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

---

### BELCHERTOWN PUBLIC SCHOOLS

BSEA # 03-5069

---

BEFORE

CATHERINE M. PUTNEY-YACESHYN
HEARING OFFICER

CAROL BOOTH, ATTORNEY FOR THE PARENTS
REGINA WILLIAMS TATE, ATTORNEY FOR THE SCHOOL

COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

Student v. Belchertown Public Schools          BSEA #03-5069

## DECISION

This decision is issued pursuant to M.G.L. c. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. § 794, and the regulations promulgated under said statutes.

A hearing was held on January 12, 14, and 15, 2004 at the office of Catuogno Court Reporters, in Worcester, Massachusetts, before Catherine M. Putney-Yaceshyn, Hearing Officer.

## PROCEDURAL HISTORY

Parents requested a Hearing on July 7, 2003 and a Hearing was scheduled for July 28, 2003. Both parties requested a postponement of the Hearing which was granted and a Pre-Hearing Conference was scheduled for September 11, 2003, the first date upon which both parties were available. A Hearing was scheduled to proceed on November 17, 19, and 21, 2003. On November 5, 2003, the Parents requested a postponement of the Hearing to allow their expert to observe Student's program. The Postponement request was granted and the Hearing was scheduled for and proceeded on January 12, 14, and 15, 2004. The Parties submitted their closing arguments on February 2, 2004 and the record closed.

Those present for all or part of the Hearing were:

| | |
|---|---|
| Student's Mother | |
| Student's Father | |
| Student | |
| Cheryl Muzio | Parents' clinical psychologist |
| David R. Drake | Headmaster, White Oak School |
| Susan Edgerly | Admissions, White Oak School |
| Carol Booth | Attorney for the Parents |
| Stacy Monette | Special Education Teacher, Belchertown Public Schools |
| Susan Fino[1] | Director, Learning Styles |
| Claire Sibilia | School Psychologist, Belchertown Public Schools |

---
[1] Testimony taken via speaker phone per agreement of the Parties.

| | |
|---|---|
| Richard McInerny | Director of Pupil Personnel Services, Belchertown Public Schools |
| Katie Thompson-Lemone | U.S. History Teacher, Belchertown Public Schools |
| Regina W. Tate | Attorney for Belchertown Public Schools |
| Catherine M. Putney-Yaceshyn | Hearing Officer |

The official record of this hearing consists of marked P-1 through P-36 and S-1 through S-71 and approximately 21 hours of recorded oral testimony.

## ISSUES

1) Whether the IEP proposed by Belchertown Public Schools for the 2003-2004 school year is reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

2) If not, whether the IEP can be modified to provide Student a free appropriate public education in the least restrictive environment.

3) If not, whether the White Oak School would provide Student with a free appropriate public education in the least restrictive environment.

## SUMMARY OF THE EVIDENCE

1. The student (hereafter, "Student") is a thirteen-year-old eighth grade student residing in Belchertown, Massachusetts, within the Belchertown Public School District (hereafter, Belchertown). Student is described as a "personable and articulate young man." His general cognitive functioning as assessed by the WISC-III (5/03) is in the average range of intellectual functioning with his Verbal IQ at 110, his Performance IQ at 98, and his Full Scale IQ at 104. Educational achievement results showed Student in the average performance range in mathematical reasoning, and reading comprehension; the low average range in listening comprehension and below average range in basic reading, pseudowords, spelling, numerical operations and written expression. His most recent occupational therapy evaluation revealed some weakness in visual discrimination and visual closure. Student demonstrates specific learning disabilities in the areas of basic reading, math computation, and written expression. Both teachers and Parents have reported Student has difficulty sustaining attention. (P-20)

2. Student began attending the Belchertown Public Schools when he was in the seventh grade and his family relocated to the district. He had previously attended another Massachusetts school district and received special education services in that district. The IEP from the prior district expired on October 31, 2002 and Belchertown Public Schools held an Annual Review Meeting on November 7, 2002. The Team discussed Student's difficulties with homework completion and with using his agenda. An IEP was proposed providing for: an OT/Special Education Consult 1 x

2

15 minutes per week; academic support with the regular education and special education staff in the general education classroom 5 x 20 minutes per week; mathematics with the special education teacher 5 x 45 minutes per week in the resource room; language arts with the special education teacher in the resource room 5 x 45 minutes per week; and summer tutorial with the special education teacher 3 x 2.5 hours per week from July 7 until August 8, 2003. The Parents accepted the IEP as developed on December 6, 2002. (P-8)

3. In a progress report dated March 28, 2003, Ms. Kimbar assessed Student's progress in mathematics, English/language Arts, and organization skills. In relation to mathematics, she stated that Student's problem during the term has been that "faithful completion of assignments has severely dropped off." She also noted that Student has failed to "either adequately or altogether complete many assignments." In English/language Arts she noted Student enjoys reading and has much more difficulty with the grammar component and he continues to need intense instruction in that area. She reported Student enjoys writing and is becoming more willing to use supports such as graphic organizers and templates. Ms. Kimbar reported that Student began the term quite successfully in the area of organizational skills, "but ended quite differently." She reported he relied "markedly" upon her to place his papers in his folder for each class. Even when she placed his work appropriately and recorded assignments in his agenda, many assignments were not done. The organizational difficulties were most apparent in geography and at the end of the term in math[2]. (S-9)

4. A Team meeting was convened on April 29, 2003, to discuss Student's third quarter grades (Fs in Geography and art and a D in math) and the foreign language requirement for eighth grade[3]. (S-26) Ms. Kimbar explained that Student's math grade had dropped during the last several weeks of the term due to Student's incomplete or missed homework assignments. Parents reported Student was "very disturbed regarding his grades" and was showing signs of school refusal. Ms. Kimbar suggested that Student receive a period of academic support in lieu of participating in the band, but Parents felt Student needed an area where he could feel good about himself. Ms. Kimbar suggested Student attend an after school homework club, but Parents felt Student needed to engage in some preferred activities such as going to the teen center. (P-16, Mother) Mother testified that the Team had previously suggested that Student drop band from his schedule to enable him to receive academic support during that period. Mother testified that Student's heart was set on playing in the band and he derives self-confidence from his participation in the band. She also testified that the Team had previously suggested that Student receive some services after school, but Parents felt Student would be tired at the end of the day and it was not the optimal time for learning. (Mother) During the meeting, the Team agreed that Student's three-year evaluation should be done early

---

[2] A progress report from November 1, 2002, noted "Completing assignments within the prescribed time limits continues to be a task that [Student] finds cumbersome. Getting him to record assignments accurately in his agenda and then consult it can be a time consuming task." (P-6)

[3] The Team agreed that Student's foreign language requirement would be waived. (Mother)

and the Parents indicated their intent to seek an independent evaluation. (P-14; Mother) The Team proposed an IEP Amendment which would provide for Student to receive color coded maps for study guides and map quizzes in geography; allow Parents to discontinue math homework and other homework assignments after twenty minutes; and implement the use of a communication log between Parents and the school. Parents rejected the IEP Amendment on May 14, 2003. (P-14)

5. Claire Sabilia, a school psychologist in Belchertown, completed a psycho-educational report after testing Student on May 20 and May 21, 2003 and observing him in his geography class[4]. She summarized that Student's verbal reasoning abilities are much better developed than his nonverbal reasoning abilities. She reported that processing visual material quickly is a relative weakness for Student and that "weakness in the speed of processing routine information may make the task of comprehending novel information more time consuming for Student." She testified that Dr. Vargo's findings were consistent with her results. She explained that Student generally has additional time for reading, but is not able to have that on standardized testing. She stated that Student would benefit from "shorter chunks of verbally presented information with visual aids to help with comprehension." She recommended that Student receive extra time for the writing process. Additionally, she recommended Student receive directions one step at a time and repeat them back to the instructor to check for understanding. She made some recommendations regarding mathematics accommodations and she recommended that Student receive study guides. (S-14, P-18)

6. Melanie Collins, M.Ed., OTR/L, completed an assistive technology evaluation of Student on May 19, 2003. She noted Student's efficient and functional ability to write legibly and reported his speed was within the average range. His typing speed was similar to his written output speed. She noted that Student "demonstrates some visual distractibility when using the computer as he quickly enters a computer game or gets off track with visual images unrelated to his topic or the task at hand. She concluded that the use of technology would not increase his speed, but may improve spelling, editing and presentation of written material. She recommended that Student have access to an Alphasmart for in class written assignments as well as access to the Inspiration program. She recommended that instructors pair visual and auditory directions and break down assignments into smaller increments. (S-15, P-16)

7. Ms. Collins also completed an occupational therapy evaluation of Student on May 19, 2003. She reported that informal testing of cursive handwriting demonstrates Student is not as proficient in terms of speed using this method of writing as he tends to prefer printing. She recommended the following accommodations to address challenges noted in visual discrimination and visual closure: allowing Student to print lengthy written assignments; providing increased time for copying tasks;

---

[4] Ms. Sabilia's assessment consisted of a record review; behavioral observation; brief interview; WISC-III-Pseudoword Decoding Subtest; WIAT-II; Test of Memory and Learning (TOMAL); and Piers-Harris Children's Self-Concept Scale. (S-14) She noted Student's Verbal IQ to be 110, his Performance IQ to be 98, and his Full Scale IQ to be 104.

4

limiting the amount of visual information on a page; and using graph paper during written assignments. (S-16, P-15)

8. An Educational Assessment completed by Jennifer Parker on May 21, 2003, indicates that Student has had challenges in the areas of organizational skills in relation to completing homework in a timely fashion and difficulty filling out his agenda properly. It also noted Student has difficulty processing auditory information and requires step-by-step directions. The assessment indicates Student is making progress except for a third term F in Geography. His Geograpy teacher reported that transitions to new material have been difficult for Student and his quiz grades were low. The assessor concluded that Student is progressing with extensive accommodations and has had difficulty adjusting to the middle school's expectation of increased independence. She concluded that "with increased preparation he can do well in the middle school." (S-18, P-11)

9. Frank E. Vargo, Ed.D., completed a neuropsychological and educational evaluation of Student on May 17, 2003[5]. Dr. Vargo concluded that Student "has strong overall language-based learning and reasoning capacities, and very good non-language based reasoning and processing abilities." He reported that Student is "delayed in his fundamental reading skills and his general expressive writing abilities." He explained "Student's reading delays are related to deficiencies in his phonological memory and related phonics and word decoding skills, as well as to deficiencies in his ability to automatically retrieve the visual codes of words at a developmentally appropriate level. He reported Student is also delayed in his expressive writing skills, specifically his knowledge and application of grammar, punctuation rules, and spelling. He noted Student's executive functioning and information processing difficulties and Student's difficulty "efficiently and consistently retrieving information that he has learned." He found Student's basic reading skills to be at the fourth grade skill level and his reading comprehension was at the tenth grade level. (Student was at the end of the seventh grade.) He reported Student's reading disability is primarily at the word level and wrote, "if he can circumvent his inability to decode/identify words, he likely has at least a reasonable capacity to comprehend and learn information presented in a text format." (S-19, P-19)

10. Dr. Vargo made recommendations to address Student's basic reading skills as follows. He recommended that phonological analysis be explicitly taught. He also recommended that reading decoding skills be explicitly taught using a "structured, developmentally progressive system." He recommended that spelling instruction be taught in conjunction with the reading instruction program. He noted that Student could benefit from compensatory learning strategies such as using books on tape and viewing videotapes. To address Student's reading fluency he recommended the

---

[5] The tests administered by Dr. Vargo were: Stanford-Binet Intelligence Scale for children-Fourth Edition; Wide Range Assessment of Memory and Learning: (Story Memory subtest); Children's Auditory Verbal Learning Test-2; Rey Osterrieth Complex Figure Test; WIAT-II; Grey Oral Reading Test-Third Edition; Comprehensive Test of Phonological Processing; Attention Deficit Disorder Behavior Rating Scale-Parent Report.

method of "repeated readings" and building Student's sight word vocabulary by using flashcards. He recommended Student be allowed extra time on learning tasks that involve reading. He recommended that Student use a "process" approach to writing to address his writing delays. He recommended that he receive guidance regarding breaking assignments into steps, organizing necessary materials and beginning and completing assignments. He recommended that while remedial writing is taught to Student, his course grades be based on his knowledge and understanding of course material, not mechanics of writing. He recommended Student be allowed extra time on all tasks involving writing. He made recommendations to address Student's executive functioning deficits as follows. He stated Student could benefit from regular daily help in the area of organization. He recommended that someone work with Student at the end of each day to ensure he knows what his homework assignments are, how to begin them and what materials he will need. He recommended that academic skills be taught in meaningful contexts. He recommended that new information be presented visually and verbally and be previewed for main idea. He recommended that Student be pre-taught key vocabulary or concepts and preview new lessons and materials for main idea and reviewing after presentation. He recommended that Student receive explicit instruction in study and organizational skills including taking notes, studying for exams, and breaking down complex assignments. He also made a number of recommendations to address Student's attentional problems. (S-19)

11. Fran Kimbar completed an educational assessment of Student on May 8, 9, and 14, 2003 consisting of the WIAT. She concluded that Student performed in the average range in mathematical reasoning and reading comprehension; in the low average range in listening comprehension; and in the below average range in the areas of basic reading, spelling, numerical operations, and written expression. She noted he did not appear to use any particular type of strategy when decoding. She also noted inconsistent approaches to encoding. She noted that his writing sample showed some organization and involved a "fair use of words that were simple in nature but effective. Sentence structure lacked control and contained a number of errors." (P-17, S-22)

12. The Team reconvened on May 28, 2003 and June 11, 2003 and proposed an IEP. The IEP provided for an "OT/SpEd Consult" 1 x 15 minutes per week. It provided for academic support with regular education and special education staff 5 x 20 minutes per week. It provided for mathematics, 5 x 45 minutes per week, language arts 5 x 45 minutes per week, and academic support 5 x 45 minutes per week in a resource room setting with a special education teacher. It also provided for a summer tutorial with a special education teacher 3 x 2.5 hours per week from 7/7/03 until 8/8/03. There were a number of accommodations listed on the IEP including the following: preferential seating; information and directions presented both visually and auditorily; frequent check-ins ; access to an Alpha –Smart for written work, note taking, and spell checking; copies of all class notes provided to Student additional time to complete tests; complex tasks broken into manageable units; a

6

regular agenda to be filled out and signed by teacher and parent daily[6]; test and quizzes to be taken in a small group in the resource room; ongoing participation in the Recordings for the Blind/Dyslexic program; all homework to be modified, not to exceed twenty minutes per subject on a nightly basis; implement the use of a communication log between the parent and school to address homework issues; provide word banks on all tests and quizzes; provide study guides for all tests and quizzes. The accommodation section of the IEP indicated that Student required the use of Dana by Alpha-Smart with the organizational tools of Palm software to make effective progress as well as access to the Inspiration program to assist with the writing process. (S-11, P-20) Parents rejected the IEP on June 22, 2003. (S-11, P-20) Mother testified that they rejected the IEP because they felt it was incomplete in services offered and "seemed patched together." Parents felt that Student needed a more intensive program dealing with the "core of his problems." (Mother)

13. Student's progress reports, dated June 13, 2003, indicate Student has demonstrated good growth in the area of decoding and shows good comprehension skills during interactive read alouds. In the area of English language Arts Composition Ms. Kimbar stated Student remains reluctant to apply the writing process skills taught in class on a consistent basis to his writing. Ms. Kimbar indicated Student continues to need support in organization and relies heavily on teachers for support and direction. In mathematics, Ms. Kimbar indicated Student's homework completion improved slightly. (S-9)

14. Student received the following grades for the seventh grade: English/RR: C+, C-, C+ B- (final grade C); Geography: B, C-, F, C-, C- (Final grade C-); Math/RR: C, C, D, C, (final grade C-); science: C-, C+, B-, C- (Final Grade C). He received a score of 232 (needs improvement) on the English language Arts portion of the MCAS[7]. (S-57)

15. On or about September 4, 2003, Mother sent a letter to Mr. McInerny in which she amended her rejection of the IEP proposed for Student in June of 2003. She accepted all of the services offered in the IEP, including the academic support in the special education setting, while maintaining her rejection of the IEP overall and of the placement. (P-21)

16. In a correspondence dated September 11, 2003, Ms. Thompson, Student's history teacher, reported Student had started off the year with a great deal of enthusiasm for the subject. She stated that Student "needs to be redirected when it comes to being organized and prepared for class." On the same date, Ms. Monette reported Student has missed math homework assignments and was improving in his English class work and homework. His science teacher, Mr. Kleindienst, reported Student had missed the only written homework assignment. (P-24)

---

[6] The IEP indicates that this is to be a written back up to Student's use of the organizational features of the assistive technology, however there is no indication that Student received any assistive technology to assist him in maintaining his agenda.

[7] Ms. Thompson testified that is considered a passing score. (Thompson)

17. The Team reconvened on September 23, 2003 after participating in a September 11, 2003 Pre-hearing Conference. The Team discussed Student receiving academic support in lieu of French and Student's father signed the application for Recording for the Blind and Dyslexic. The Team discussed extending Student's school day to four afternoons per week for one-hour sessions. Student would work with a trained provider in systemic decoding, vocabulary/pre-teaching, and pseudowords. (P-22)

18. The Team determined Ms. Monette would be working with the tutor, Mr. Kleindienst, and Ms. Thompson to coordinate the material and vocabulary for Student's extended school day. Mr. Kleindienst expressed concern regarding Student's need for extra support with some upcoming lessons in regard to the math portion of the lessons. The possibility of Student receiving some support around those lessons during academic support was discussed. Ms. Monette stated that she had been working with Student on organizational strategies and had created a new system using a binder system and she would try other ideas if that did not work. Ms. Monette stated that Student's agenda is signed by her every day and is a useful tool for communication between the parents and her and she provided Father with her direct extension if Parents wished to contact her with concerns. (S-7) Minutes of the Meeting indicate the Team discussed extending Student's school day for an hour four days per week and providing Student with vocabulary in advance of lessons so Student could follow along better. The minutes indicated Student would begin tutoring October 1 and that there was to be communication between Parents and the school via the agenda. (P-22)

19. Student received a progress report dated September 29, 2003. His math teacher, Ms. Monette, indicated Student's recent progress was good, he was passing, and his homework completion was improving. She also stated his class participation was excellent. In English, Ms. Monette reported Student's progress was satisfactory, he was passing and he was improving with homework completion. In science, his teacher reported his progress was satisfactory, he was passing, and he recommended that he increase study preparation. He commented Student had made good start, but additional studying of upcoming material would be helpful. In history, Ms. Thompson reported Student was making satisfactory progress and passing. He was missing two of twelve homework assignments and his participation was excellent. (S-1A)

20. Susan Fino testified that she has been privately tutoring students for the past 17 years. She has consulted with school districts and trained teachers. Her specialty is in reading and decoding, executive functioning, written expression, math and organization. She uses the Phono-Graphix program to tutor Students in decoding. (Fino) "Phono-Graphix is an innovative, rapid decoding system with an emphasis on developing phonological processing skills. It is research based and can be used either in a classroom group or one-on-one. If taught one-on-one it allows most students to rejoin the classroom reading program, often in less than 20 hours, with grade level decoding skills." (P-28, S-3) Ms. Fino testified that in 1996 she read

8

about the Phono-Graphix program and researched it received training in the program. She was interested in the program because she works with many older students and has found that other methods took a long time to teach and required good memory and motivation. She was looking for a program that contained the essentials and not any extra material. She found that the memory component in most reading program is too heavy. She began using the program in her tutoring after having been trained. (Fino)

21. She described the four stages in the Phono-Graphix program. She testified that in the first stage the tutor teaches blending and concepts that letters are pictures of sounds. The student has to be taught the code and to blend and manipulate the sound. The second stage adds more sound pictures, multisyllabic words, and chunking syllables until decoded. Students are taught to recognize sound pictures, and be flexible. She has tutored 300-400 students using Phono-Graphix and continues to see success. She testified that the Phono-Graphix method is successful. She testified that she has met Student and has worked with him and observed tutors working with him. (Fino)

22. She testified that she also provides tutoring in the area of organizational skills and has written an organizational skills program called "Take Charge." Ms. Fino testified that the program can be provided to students in a small group or 1:1 and it helps students to improve executive functioning. It teaches students to recognize challenging and difficult areas, identify goals, and learn to structure themselves so that they can be successful. The program teaches students to break down tasks and organize materials. She stated that she could provide consultation to school staff for providing the program or she could provide tutors trained in the program. (Fino)

23. Ms. Fino testified that Belchertown contracted with Learning Styles to provide tutoring to Student after school. She explained that Learning Style offers tutorial services during the school day and after school. They are able to provide tutoring during the day. There is one student besides Student who receives his tutoring after school. Student began receiving tutoring using the Phono-Graphix program from Learning Styles on October 1, 2003 and attended 17 sessions during October. (He attended his scheduled four sessions per week during October.) (S-6) Student's word attack skills were informally assessed on October 2, 2003 and his blending and phoneme manipulation skills were deemed "Good" and his phoneme segmentation and code knowledge were assessed as "Poor." In October 16, 2003, his skills in the four above-mentioned areas were assessed as "Good." In November Student attended 11 sessions and in December he only attended 5 sessions. He attended a few times in January, for a total of approximately 35 sessions. His participation in tutoring sessions decreased in November and December because he was engaged in rehearsals for the drama club play. (Fino)

24. Susan T. Fino, M.Ed., C.A.G.S., wrote a report of her initial assessment of Student on October 2, 2003. She reported Student had a strong sight word vocabulary and adequate to good comprehension skills. She reported Student had difficulty with phoneme segmentation when reading text. She indicated Student was showing

9

improvement in his code knowledge, but he had difficulty recalling the various spellings of certain sounds. She concluded that it appears necessary to review often, revisit previously learned sounds, and apply his skills to grade-level reading material to reinforce this knowledge. She stated Student is improving in his use of decoding skills and can use them if prompted. She further observed that when Student reads independently or in a subject area, his decoding skills are not automatic. She recommended that Student continue to receive reading decoding instruction and that textbooks from subject areas be used to assist in decoding instruction. (S-5, P-25)

25. Student was also administered the Woodcock Reading Mastery Test by Learning Styles as a pre-test prior to the commencement of tutoring sessions. In the area of word identification his grade equivalent score was 5.3 and in the area of word attack his grade equivalent score was 6.4. Shortly before the hearing, and approximately three months after the pre-test was given, Student's word identification score remained at 5.3, and his word attack score had increased to 8.0. Student had received approximately 35 tutoring sessions at that time. Ms. Fino testified that if a student has high word identification score, it means he is using sight to read, not decoding. If the student has high word attack scores, he is relying on decoding. (Fino)

26. Mother testified that Student is very upset that he has to attend tutoring sessions after school. She stated that he struggles with academics, but is very involved in band and drama club. She stated that after-school activities are very important to Student and he begs to not have to attend tutoring. (Mother) Ms. Monette agreed that Student initially was unhappy about going to tutoring because he was worried it would interfere with his participation in the drama club. Student spoke to the principal about his concern and the number of days he is being tutored has been reduced to allow for his participation. Since the number of tutoring sessions per week has been decreased, Ms. Monette does not hear him complaining about it. (Monette, Mother, Student)

27. Student testified that he has Fridays off from tutoring because he has drama club. He enjoys drama club and has no trouble memorizing his lines for the play. He explained that he had a speaking role in the upcoming drama club production. Student is in the band at the Chestnut Middle School. The band practices second period every day. He has gym first period every day. Student likes the band and wants to continue to play the baritone horn. He said that counting beats helps him in other classes. (Student)

28. Richard McInerny, the Director of Special Education and Pupil Personnel Services in the Belchertown Public Schools, explained that Belchertown offered Student four sessions per week of tutoring at Learning Styles, but that Student had not received the services four times per week due to his request to attend drama club rehearsals. Mr. McInerny testified that there were two sessions in which the tutor was absent and a substitute was not available and he had agreed to provide compensatory

10