services for the two missed sessions[8].    (McInerny)  Student's 2003-2004 class schedule has no free periods. He has gym/health/computer first period every day and band second period every day.  The remaining periods are all filled with academic subjects, including his academic support period.  (S-1)  At the April 2003 Team meeting, Parents made clear their desire for Student to continue participating in the band. Mother testified that she believed it was important for Student to participate in extracurricular activities, including after-school activities such as drama club and going to the teen center. (P-14, Mother)

29.  Ms. Fino testified that Student has made progress in the Phono-Graphix program. She stated that in the area of word attack skills, Student is able to decode nonsense words at grade level.   He is working on decoding words in isolation and generalizing.  She testified that it is difficult to teach older students to transfer their skills.  They sometimes rely on old skills such as guessing.  She encourages Student to use literature to practice decoding instead of relying on flashcards.  She uses SAT books and lets students decode SAT words so they will know they can apply rules to different texts.  She found Student very willing to work and not resistant to tutoring. She explained that Student is successful at the highest level of reading which is comprehension.  She did not see any reason why Student will not be able to decode at a level within the average range.  She reported that Student reads slowly.  She would like him to read at a rate of 100 words a minute or faster.  She explained that he sounds pretty good orally, but she would like him to be able to read silently as fast as orally.  The tutors have reported that he sounds fine orally, but needs to be able to read faster.  Student currently reads about 92 words per minute.  She believes his processing is still a little slow and he is still trying to figure out the code. (Fino)

30.  Ms. Fino testified that Dr. Vargo's word reading score was a little lower than she attained and the pseudo word reading score was assessed much lower.  She assessed Student at the sixth grade level and Dr. Vargo assessed Student at the second grade level.  She testified that Student has made very good progress on decoding. Ms. Fino testified that Phono-Graphix does not address executive functioning or organizational skills.  She recently discussed consulting to the Belchertown teachers with Mr. McInerny. (Fino) Mr. McInerny testified that he has researched providing Phono-Graphix training for Ms. Monette, but has not provided it yet.  He admitted that he was aware that Learning Styles could provide assistance with organizational skills if requested by the district, but he had not requested that Student be provided with organizational assistance. (McInerny)

31.  Student's December 2003 progress report in the area of math indicates Student's recent progress is inconsistent, his status is "borderline" and he requires increased study preparation.  His average is a 62% and he has incomplete homework, low test scores, and is not working to his potential. (Ms. Monette testified that Student is not completing his homework outside of the classroom and she was not seeing much study preparation.)  His recent progress in U.S. history is good, he is passing, and his quiz and test scores are high.  His teacher indicates that he needs to improve getting

---

[8] Student's testimony corroborated Mr. McInerny's.

homework in on time. In science Student's progress was deemed inconsistent, his present status was passing and the teacher recommended that he increase study preparation. His class performance was deemed "fine". His science teacher indicated Student's homework and lab sheets done at home are problematic and his organization is still a problem and may be why he loses work. In the area of English, Ms. Monette reported Student's progress as satisfactory and his status as passing. His average was 73% and homework completion was affecting his grade. (P-32)

32. Stacey Monette testified that she is Student's eighth grade special education teacher. She described Student as the most unique Student she has ever taught. She stated that he is energetic and enthusiastic, he fully participates, and is a joy to have in class. She testified that she attends his U.S. history class with him and Student always volunteers to read orally or act out an historic scene. He is comfortable in history class and open to discussion with the teacher and classmates. Other classmates look to Student to hear his opinion. She testified that he sounds like a fluent reader when he reads in class. She reported that he is very confident and his volunteering to read shows his confidence. She teaches his small group English/language Arts and Math classes. She stated that she puts graphic organizers on the board when they do activities with graphic organizers. She always writes the homework on the board and calls the students' attention to it every day. She testified that she checks Student's agenda and signs it every day except when he has lost it. Ms. Monette testified that she sees Student at the end of each day and he does not seem fatigued. She noted that he does seem antsy and anxious to be done, and talkative. She testified that Student seems to be very tired in the morning but perks up by second period. (Monette)

33. Ms. Monette testified that she met with one of the tutors, Lisa Chambers, and Ms. Chambers asked her to provide her with material for pre-teaching along with the Phono-Graphix program. Ms. Chambers explained she would be using the words to carry over the skills learned in Phono-Graphix  Ms. Monette agreed that each Monday she would leave her a brief description of what they would be working on that week and what words they would be using in science and history that week. Ms. Monette testified that she does pre-teaching in the resource room and post-teaching. In English class, every Monday, students take a pre-test in spelling that gives them a baseline of what words they really need to study for Friday. They begin discussing vocabulary words and that continues throughout the week. She posts five of the twenty words on the board every day and they discuss the vocabulary words every day to prepare for the test at the end of the week. She testified that pre- and post-teaching for the academic areas is done mainly in academic support. They give study guides every week and she instructs her paraprofessional on what should be covered in academic support. (Monette)

34. Ms. Monette testified that she goes to history class with Student and her main role is to support the history teacher. She walks around the room and makes sure students are on task and understanding. She makes sure that if there is a project coming up they know where they need to begin and what the timeline is for the project. She

makes sure they write down their homework assignment and makes sure they did the homework. During class activities she checks in with students throughout the class to make sure they are following along with what is being done in the classroom. The history teacher, Ms. Thompson, uses a multi-sensory approach to teaching. Ms. Monette described her as "phenomenal" and stated that no two lessons have been alike in her class since September. If she has to, she will individualize her lesson for a student. She has seen no indication in history class that Student is not accessing the curriculum. He has done very well on the tests and the projects. Student is not doing as well in science as he is in history. The homework is an issue in science. He seems to be doing okay on labs and tests and quizzes. The science teacher has reported Student is involved with labs and tends to be a leader when they break in to lab groups. (Monette)

35. There are seven students in Ms. Monette's English/language arts resource room and they have similar profiles and are all in eighth grade. She follows the curriculum frameworks for eighth grade. All of the students, including Student, are not reading at an eighth grade level. She pulls materials from whatever materials she can for students to understand. She uses the eighth grade texts when appropriate, if she thinks the material is too difficult she can parallel the curriculum frameworks with material the students can understand. Student's reading is fluent in class. He volunteers to read and does not falter. If he is stuck on a word he tries to sound it out, sometimes self-corrects and sometimes needs assistance. He reads with inflection and meaning. She has read some novels with Student; they are listening to them on tape and doing follow up comprehension questions and activities. They have read short stories orally from the eighth grade text. Student is able to answer the comprehension questions. (Monette)

36. The writing process she uses with students involves brainstorming, a first draft, peer editing, self-editing, writing conferences with Ms. Monette. The paper is reviewed four or five times before the final draft is completed. Student loves writing and is very creative and imaginative. Student's deficits in writing are in mechanics and spelling. They are currently working on grammar. She is providing students with text to which they have to add punctuation. They will be working on this unit for a couple of weeks and the ultimate goal is for Student to be able to self-edit. Student uses a computer in her classroom. It is always available to him and he asks to use it. There is an Alphasmart available for Student to use if he wants to. At the beginning of the year she approached Student and left it open as to whether he wished to use the Alphasmart or the computer. She explained that Student is very good on the computer and is able to make corrections and use the thesaurus. Student has never told Ms. Monette he wanted to use the Alphasmart. (Monette)

37. Ms. Monette's math resource room class consists of ten eighth grade students. She has books from grade 6-8 on her desk. The sixth grade text contains the same concepts such as ratios and percents at a lower level than in the eighth grade text. She keeps them mainly in the eighth grade book and does as much modification as she can to keep her student in that text. She will go down to the seventh grade text if

necessary and then to the sixth. Even when using the lower level texts she is covering topics required for the eighth grade curriculum frameworks. Student is not currently doing as well as he did first marking period which is consistent with the rest of the class. They are covering more difficult material. If homework was completed Student would be doing much better. He gets mostly Cs on quizzes and tests. Student is one of the higher level students in her math and English/language arts classes. (Monette)

38. Ms. Monette testified that she has read Dr. Vargo's report and believes it does not accurately reflect Student's performance in reading and written expression. She believes he tested lower than she would have expected him to test. She testified that homework has been an issue in other courses besides math. She does not believe that he is a student who does not do his homework. Most of the time the homework is complete, but he can not find where he placed it, "It is a huge problem." She stated that he has issues with organization, finding things, and recalling where he has placed things on a daily basis. He is constantly going back to his locker to look for things. It is frustrating for him. There have been occasions where she has seen his completed homework and two periods later in history class he cannot find it. In September she helped him clean out his locker and his binder and she set up a binder with an individual folder for each subject area. On two occasions she has assisted him in cleaning out the binder. She has helped him create a math portfolio that all his math work goes into which stays in the math class. There is also a writing folder that does go home, but Student knows how important it is to bring it back. She has made a spelling binder and a language exercise binder for him. It seems to help if he can locate that binder. She did that because she immediately realized that if Student is given a worksheet it will likely be lost. She has had discussions with him about cleaning out his backpack as well. Student has been very successful in bringing his writing folder to class. She has never used as many strategies with a Student as she has with Student. She testified that she has never seen a Student as disorganized as he is throughout her entire teaching career. (Monette)

39. Ms. Monette testified that all students in the school use an agenda. She checks agendas daily and signs them daily if it is in their IEP. She uses agendas to communicate with home. If a student is missing a homework assignment, she writes a note to the parent in the agenda. On the first day of school she asked the Parent to review and sign the agenda. That did not occur for the rest of the semester. Ms. Monette did not do anything about it. She testified that not all parents sign the agenda and when she sends the agenda home she assumes the parent is looking at it. She mentioned that the agenda was her primary means of communication to Father at the September Team meeting. Student lost his agenda during the semester. On the second day when Student came to class without it, she called Mother who agreed to make sure Student found it. Neither Parent has contacted her about Student since September. She has not contacted Parents because she only calls Parents when she has to and mostly due to behavior problems. She reported that she wrote in his agenda when homework assignments were missing and she assumed Parents were reading it. (Monette)

14

40. On certain days, but not on others, Ms. Monette signed Student's agenda. (See P-34) There were notes from Ms. Thompson on a handful of days. Mother signed that agenda on September 8, 9, and 29. (P-34)

41. Ms. Monette testified that academic support is used for extra reinforcement of the main content areas, particularly history and science, working on projects and study skills. Lately Student is completing homework during study skills class. Ms. Piwcio, a paraprofessional, teaches academic support. She checks in with Ms. Monette every morning and Ms. Monette directs her as to what the students should work on during academic support. (Monette)

42. Cheryl Muzio testified that she is a clinical psychologist engaged in private practice in Northampton and is employed as a school psychologist in Ashfield. She testified that she reviewed Student's records[9] and spent one day shadowing him at school on December 2, 2003, pursuant to Parents' request. She did not test Student. She testified that she was concerned about Student because she believes most students his age have been "more successfully remediated than Student."

43. Ms. Muzio testified that she observed Student in gym, history, science, band, resource room English and math and academic support. She noted that he was very engaged and interested in history class and the teacher was lively and engaging. She described his science class as "a little chaotic." There were 20 students and they were working in groups and doing experiments. She reported that Student was a leader in his group. She testified that the special education aide was present in the classroom and "didn't strike me as a teacher." She did not find that the aide provided a lot of instructional assistance. She did not observe the aide checking to ensure Student had written his homework assignment. She described the science lesson as complicated and she thought it was a challenge to keep it all organized. She did not ask Student if he found it as she described it and did not ask the teacher how he believed Student performed. She noted there was a lot of copying from the board and that Student was provided with written notes by the aide. (Muzio)

44. In his English/language arts class, Ms. Muzio testified students were working on descriptive words and noted the words Student came up with were "fine." She also observed a literature lesson and testified that Student performed "adequately" when he read aloud. She testified that the class discussion of the literature was appropriate. She testified that Student did not have his agenda with him and Ms. Monette offered to write the assignment for him and told him he would join her for lunch if he forgot the agenda the following day. He was engaged and actively involved with the class. Ms. Muzio testified that Ms. Monette did not offer Student sufficient organizational assistance, but did not specify what kind of assistance Student required. She thought Student seemed to meet the classroom expectations. Ms. Muzio testified that the class "seemed like a language arts class, not a class that taught basic reading and writing." (Muzio)

---

[9] She testified that she reviewed Student's current IEP, the May 2003 psychological and educational reports,, Dr. Vargo's report, and the occupational therapy reports in the record. (Muzio)

15

45. Ms. Muzio testified that the math lesson she observed was difficult for Student and others in the class. He was engaged and trying hard. She reported Ms. Monette was patient and at one point Student said "I think I've got it." During academic support Student took a make-up test in the hallway. She testified that the aide gave him a hint about one problem and she was unsure why, but did not ask her why. After Student took the test, the aide provided students with a science study guide. Ms. Muzio found the study guide to be visually very busy. She testified it was not the most useful method of review because of Student's reading inefficiency and executive functioning and processing speed. She did not ask Student if he found it to be useful to him. She testified that during academic support the aide handed things out and kept order, but "is not a teacher." Ms. Monette returned for the last ten minutes of class and instructed the students to review their study guides.

46. Student's Phono-Graphix tutor was absent on the day of her observation, so Ms. Muzio was unable to observe a tutorial. She testified that she spoke to Lisa Chambers and Megan Norman by telephone on December 9, 2003. Both tutors found Student to be motivated and hard working. Both reported that Student had made some progress. Ms. Muzio testified that the tutors thought the scope of services provided to Student was insufficient in terms of the time allotted and services needed to be more comprehensive than one hour of tutoring. She reported that the tutors told her the tutoring model is not sufficient for Student. Ms. Muzio testified that the tutors told her they were initially teaching phonemic awareness and then began providing academic support as well. The tutors did not make any specific recommendations for Student's services. They did not comment on Student being tired during tutoring, but they thought it was a lot for him, although they saw him as engaged and trying hard. (Muzio)

47. Ms. Muzio testified that she did not observe the provision of any services to assist Student with homework completion or organization during the day. She concluded that Belchertown's program is not appropriate for Student. She described Student as having a "very severe reading disability." She testified that she found it inappropriate that Student's direct reading instruction was being taught after school and was dependent on the availability of a single person. She found that the support of the aide in the content area was inappropriate because she "was not a teacher" and did not provide appropriate support. (Muzio)

48. Ms. Muzio recommended that Student receive direct instruction in decoding as part of "his regular school day." She also stated that he required direct instruction in word identification and fluency, help with written output, and keyboarding instruction because his writing is "laborious." She recommended he have access to programs like Inspiration and access to graphic organizers. She testified that there had to be a teacher in the classroom aware of his needs at all times to ensure instruction is received in a manner that is useful to him. She testified that a multi-modal approach is good for Student. She said he required pre-teaching, review and study strategies to be employed throughout the day. She testified that the pace of the

16

class is pretty quick[10]. She did not ask Student if he thought the pace of any of the classes was too quick for him. She stated that Student's teachers seemed good, especially his history teacher. She found her teaching methods to be appropriate and the science teacher's to be more "conventional". She stated that nobody was checking in with Student in the content areas. She had previously stated that the aide checked in with Student three times, but the emphasis was not instructional, it was to keep him on task. (Muzio)

49. Ms. Muzio testified that she was familiar with pre- and post- testing scores attained by Learning Styles. (P-25) She reviewed the scores and noted that Student is making some progress in the "foundational skills that underlie his ability to read." She stated that his ability to identify words does not seem to have progressed. She explained that Student is getting "some more pieces" but had "not pulled it together yet." She concluded that Student is making some progress in phonemic awareness and the ability to blend sounds, but word reading is still a challenge for him. She testified that if Student continues to skip or miss words he reads in the content area, his ability to access the curriculum will be severely hampered. Ms. Muzio testified that Student is very bright and is able to "keep his head above water" especially in history where he is interested and the teacher is engaging. She testified that as he moves on in grades and the demand for independent reading and writing increases, he will not be able to keep up unless he has greater fluency in reading. (Muzio)

50. Ms. Muzio testified that she did not speak to any of Student's teachers or his aide regarding their perceptions of his functioning in class[11]. She did not review lesson plans to find out what material was covered before her observation or what would come next. She spoke to Student "some" and he acknowledged his difficulty with staying organized. She testified that she is aware that Student sometimes completes his homework and cannot locate it to hand in to the teacher. She agreed that was part of his executive dysfunction. Ms. Muzio testified that in history class, nothing indicated Student was not accessing the curriculum. In science she stated it was unclear whether the small group Student was in was following everything and she did not ask Student. (Muzio)

51. Ms. Muzio made a series of recommendations for Student's services. She stated that there had to be consistent expectations across the curriculum regarding when assignments were given and recorded and checking in to ensure Student wrote his assignments down and understood the necessary steps to complete them. She recommended that if Student was chronically late or missing homework there needed to be a systematic response. She recommended the use of an agenda with assignments written in the same place for the same subject each day and someone checking it for accuracy and Student's understanding. She testified that she was aware Dr. Vargo had recommended compensatory strategies be taught for reading

[10] She did not specify which class she was referring to.
[11] She testified that she believed that students in Student's science small group were not moving at the same pace as the rest of the class. She stated that she thought some of the other group members were special education students, but she did not ask anyone if her belief was accurate.

and stated that while that is important, it is not a substitute for direct instruction in decoding and fluency. She stated that Student needs drilling of sight words and needs to develop decoding skills and sightword vocabulary that includes content area vocabulary. (Muzio)

52. Ms. Muzio summarized her concerns with the Belchertown program. She stated that she is concerned that the direct reading instruction occurs after school and not as part of Student's "regular program." She stated that he does not have adequate support, especially in the content areas. She stated that she was concerned by the nature and pace of instruction and that Student had no access to appropriate technology. She also was concerned that he did not have instruction in keyboarding. She testified that she thought Student was understanding the history and she admitted that although she suspected Student was not understanding the science lesson she did not ask him. Ms. Muzio had not direct knowledge of the current White Oak School program. (Muzio)

53. Student testified that he likes the competition in some classes and he likes his writing class. He stated that reading and spelling are sometimes difficult for him as is memorizing. He stated that his organizational skills are weak. He testified that the special education teacher is present in all of his classes and he receives some modifications. In science, Ms. Piwcio, the aide, sits behind the special education students who sit in the back and during tests she accompanies him to a separate room. He stated that he can raise his hand and she will come to assist him if necessary. If he encounters a word that he does not know she will ask him what he thinks it means and then tells him. He testified that in science they review vocabulary before tests, but never before a unit begins. He stated that he has no access to an Alphasmart, although he found it helpful in his previous school. (Student)

54. Student testified that during Academic support with Ms. Piwcio he studies for upcoming tests or reviews vocabulary for upcoming tests or gets assistance with homework from other classes. He also works on projects from other classes. In the area of organization, Ms. Monette gave him a binder with four folders for each class. He said the binder does not really help and he has loose papers everywhere. He has an agenda which Ms. Monette signs. During tutoring he organizes his backpack and binder once per month. He stated that he is not currently having any instruction in organization. He testified that he does not have trouble using the agenda. (Student)

55. Student testified that he likes his U.S. history class because he gets to debate, write, and act all in one class. He explained that his teacher likes what he does in class. He does writing in history including answering questions and writing in his journal and writing dialogues. There are two computers in the room that he can use for projects. Student testified that he enjoys science and does well. He is studying physics and they sometimes do labs. He has never felt the need to use a computer in science and he gets a copy of the notes. He testified that he has some really good friends at school. He testified that Ms. Monette recently tried using a math binder with him and

18

"it has been working.". He stated that he sometimes forgets that he has homework if Ms. Monette forgets to sign his agenda. He sometimes finds his homework assignments in the wrong folder. Sometimes he does the homework and cannot get it passed in and sometimes he does not do the homework. He testified that the tutors reviewed vocabulary with him and told him that they wanted his homework to apply to Phono-Graphix and vice versa. Student stated that he is currently interested in Edgar Allen Poe and he recently read his autobiography. He testified that he visited White Oak and learned a lot. He liked that the tutors were all teachers and it had a nice gym. He was impressed with their A.V. equipment. He stated that he does not receive the book list from his language arts class in time to order the book on tape, but Ms. Monette sometimes has it in class. (Student)

56. Mr. McInerny testified that Ms. Monette would be going on maternity leave in April and he was unsure who would take over her classes. He testified that the Belchertown Public Schools could meet Student's needs and placement at White Oak was not necessary for Student. He confirmed that Belchertown is not providing language remediation in the content area classes. (McInerny)

57. Katie Thompson testified that she is Student's eighth grade history teacher. She testified that in her teaching she tries to tap as many multi-intelligences as possible so that every student can be successful. She testified that students in her class participate in a least three different activities during the forty-five minute period to tap into the different ways to learn. She testified that she always gives students a preview of what is coming and highlights what they have learned. She always pulls the information together when they reach the end of a unit. She reported that Student is doing great in her class. He gets scores in the 80s and 90s on projects, tests and quizzes. Student uses an eighth grade text that he is required to read as part of his homework. He understands the content, as is reflected in his writing. She testified that her students do writing assignments in class. She explained that Student's performance began to slide in November and she gave him "a little pep talk." Student responded by completing all of his homework. She testified that Student is accessing the eighth grade curriculum in her class. She explained that he understands difficult material such as the Constitution and federalism. Ms. Thompson stated that she does not check Student's agenda every day, but she sometimes writes in it. She does not pre-teach vocabulary in class, but she pre-teaches concepts. (Thompson)

58. David Drake testified that he is the headmaster at the White Oak School and is familiar with Student through a parental history and he has met Student. He has never observed Student in class. He testified that White Oak was an approved special education school with programs for students with language based learning disabilities from grade four through twelve. He testified that their staffing ratio is one certified teacher to every three students. He stated that the teachers are required to have certification and most have special education certification and receive intensive in-service training. The school emphasizes providing remedial services

within the classroom throughout the day. He explained that the school uses Orton-Gillingham principles to teach phonemic awareness directly. (Drake)

59. Mr. Drake testified that at White Oak each Student has a tutor who is a certified teacher and acts as case manager. Students have a daily tutorial for fifty minutes. All of the tutors are also classroom teachers. During a tutorial, students work on decoding, spelling and some composition. They also work on organizational skills such as time management, organizing binders and book bags, and using a calendar. The content area classes are grouped according to age and skill level. They sometimes practice note taking and the class "mimics what an inclusionary classroom might be like." They receive direct instruction in language sub-skills and use the same format for note taking, outlining, and essay writing in all classes. There are enough computers in each classroom for each student and students can e-mail work from home and print it out at school. He stated that many students participate in extracurricular programs at their LEA and it is a thirty to thirty five minute drive from White Oak to Belchertown. (Drake)

60. Student received the following grades during the first quarter of the current school year (eighth grade): English: B-, U.S. history: B-; Math: C; Science: D. Ms. Monette commented that Student "needs to work on organizational skills." She also noted Student "Fails to finish assignments." (P-29)

## FINDINGS AND CONCLUSIONS:

Student is an individual with a disability, falling within the purview of the Individuals with Disabilities Education Act (IDEA)[12] and the state special education statute.[13] As such, he is entitled to a free appropriate public education (FAPE). Neither his status nor his entitlement is in dispute. Under the FAPE standard, the IEP proposed by the school district must offer the student a free appropriate public education that meets state educational standards. This education must be offered in the least restrictive environment appropriate to meet the student's individual needs[14]. Federal law also requires that the student be able to fully participate in the general curriculum to the maximum extent possible. 20 USC § 1415(d)(1)(A)(iii); 34 CFR 300.347(a)(2)(I) and (a)(3)(ii); 64 Fed. Reg. No. 48, page 12595, column 1; See also, In Re: Worcester Public Schools, BSEA # 00-1912, 6 MSER 194 (2000).

As discussed in In re: Gill-Montague Public Schools District, BSEA # 02-1776, "the Massachusetts statute defines FAPE as "special education and related services as consistent with the provisions set forth in 20 U.S.C. 1400 et seq. [the IDEA], its accompanying regulations, and which meet the education standards established by statute or established by regulations promulgated by the board of education,"[15], including the

---

[12] 20 USC 1400 et seq.
[13] MGL c. 71B.
[14] 20 USC 1412(5)(A)
[15] MGL c. 71B, §1.

Massachusetts state curriculum frameworks.[16] The IDEA in turn defines FAPE as "special education and related services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 614 (d)." [17]

As stated by the federal courts, the LEA is responsible to offer students meaningful access to an education through an IEP that provides "significant learning" and confers "meaningful benefit" to the student[18], through "personalized instruction with sufficient support services ..." [19]. The requirements of the law assure the student access to a public education rather than an education that maximizes the student's individual potential. *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993); *GD v. Westmoreland School District*, 930 F.2d 942 (1st Cir. 1991).

The First Circuit Court of Appeals interpreted minimally acceptable standards of educational progress requiring that the IEP yield "effective results" and "demonstrable improvement" in the "various educational and personal skills identified as special needs,"[20] in the context of the potential of the particular student.[21]

---

[16] See the *Mass. Department of Education's Administrative Advisory SPED 2002-1: Guidance on the change in special education standard of service from "maximum possible development" to "free appropriate public education"* ("FAPE"), Effective January 1, 2002 (hereafter *Mass. FAPE Advisory*), 7 MSER Quarterly Reports 1 (2001).

[17] 33 USC 1401(8). The federal regulations adopted pursuant to the IDEA include a similar definition of FAPE. 34 CFR 300.13.

[18] For a discussion of FAPE see *Hendrick Hudson Bd. Of Education v. Rowley*, 458 U.S. 176, 188-189 (1992); *Cedar Rapids Community School District v. Garret F.*, 526 U.S. 66 (1999); *Burlington v. Department of Education*, 736 F. 2d 773 (1st Cir. 1984). *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000); *Stockton by Stockton v. Barbour County Bd. of Educ.*, 25 IDELR 1076 (4th Cir. 1997); *MC v. Central Regional School District*, 81 F.3d 389 (3rd Cir. 1996), *cert. denied* 519 US 866 (1966); *Ridgewood Board of Education v. NE*, 30 IDELR 41 (3rd Cir. 1999). See also *GD v. Westmoreland School District*, 930 F.3d 942 (1st Cir. 1991).

[19] *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049 (1982).

[20] *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993) (program must be "reasonably calculated to provide 'effective results' and 'demonstrable improvement' in the various 'educational and personal skills identified as special needs'"); *Roland v. Concord School Committee*, 910 F.2d 983 (1st Cir. 1990); *Burlington v. Department of Education*, 736 F.2d 773, 788 (1st Cir. 1984).

[21] *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000) (a disabled child's development must be measured with respect to the individual student, not by his relation to the rest of the class, as declining percentile scores may represent the student's inability to maintain the same level of academic progress achieved by regular peers and not necessarily a lack of educational benefit); *Ridgewood Board of Education v. NE*, 172 F.3d 238 (3rd Cir. 1999); *MC v. Central Regional School District*, 81 F.3d 389 (3rd Cir. 1996), *cert. denied* 519 US 866 (1996); *Roland v. Concord School Committee*, 910 F.2d 983 (1st Cir. 1990); *Kevin T. v. Elmhurst*, 36 IDELR 153 (N.D. Ill. 2002).

Similarly, the Massachusetts special education statute defines "special education" to mean "educational programs and assignments . . . designed to develop the educational potential of children with disabilities . . ." which permit a student to make meaningful educational progress.[22] MGL c. 71B § 1, the special education statute in Massachusetts, requires that eligible students receive special education services designed to develop the student's individual educational potential"[23] consistent with the interpretation provided by other Courts. The IEP is the road map that defines the services to be offered and the measurable goals embodied therein determine whether the student has made educational progress.[24] See also, *In Re: Arlington Public Schools*, BSEA # 02-1327, issued on July 23, 2002.

There is not significant disagreement regarding the Student's profile. The central dispute in this case involves the level of services Student requires and whether the Belchertown Public Schools can provide appropriate services to address his needs. The Parents believe that Student's academic difficulties stem primarily from his reading disability and that he requires a day placement in a school designed to meet the needs of students with language learning disabilities. Belchertown believes that it can appropriately meet Student's needs using the model proposed in its IEP for the 2003-2004 school year, a combination of resource room instruction, inclusion, and tutoring. I am not persuaded by either party in that regard. While I agree with the Parents that the IEP proposed for Student for the 2003-2004 school year is not reasonably calculated to provide him with a free appropriate public education in the least restrictive environment, the evidence does not show that Student requires a placement as restrictive as the White Oak School. The evidence does show that Belchertown's program can be modified so as to make it appropriate for Student.

Belchertown's proposed IEP is deficient in several ways. First, the IEP does not provide sufficiently for what appears to be Student's greatest weakness, his organizational skills. The IEP that Parents rejected on June 22, 2003 (which is the only IEP on the record that was rejected by the Parents and is the IEP from which Parents accepted services on September 4, 2003) contains goals and objectives in the area of "Organization Skills-Study Skills", but does not provide for any direct services in this well documented area of weakness. Belchertown was on notice that Student's organizational skills were impacting

---

[22] The Massachusetts Department of Education (DOE) stated that the "FAPE standard . . . requires the school district to provide personalized instruction tailored to the student's needs, with sufficient support services to permit the student to make meaningful educational progress." *Mass. FAPE Advisory* (see footnote 8 above for full title and citation of Advisory) (emphasis supplied).

[23] 603 CMR 28.01(3). The Massachusetts Department of Education has also noted that the Massachusetts Education Reform Act "underscores the Commonwealth's commitment to assist all students to reach their full educational potential." *Mass. FAPE Advisory* (see footnote 8 above for full title and citation of the Advisory). M.G.L. c. 69, §1 states in part that a paramount goal of the commonwealth is "to provide a public education system of sufficient quality to extend to all children the opportunity to reach their full potential."

[24] *County of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458 (9th Cir. 1996) (the correct standard for measuring educational benefit under the IDEA is whether the child makes progress toward the goals set forth in IEP and not just whether the placement is reasonably calculated to provide the student educational benefits.); *Evans v. Board of Education of the Rhinebeck Central School District*, 930 F.Supp. 83 (S.D. N.Y. 1996) (the IEP must include measurable criteria to assess the student's progress).

his progress and ultimately his grades. During the first Team meeting held in Belchertown, the Team discussed his difficulties with homework completion and using his agenda. (P-8) Student's March 28, 2003 progress report noted his difficulty completing homework assignments and flagged the difficulty he had in the area of organizational skills. (S-8; Paragraph 3)

Ms. Monette testified that Student was the most disorganized Student she had encountered in her career. She described the binder system that she had implemented to assist Student and the use of binders for worksheets and folders in math and language arts. However, she acknowledged that Student's organizational skills did not improve as a result of her intervention. She testified that Student would sometimes complete an assignment and show it to her and would lose it by the time he was to hand it in two periods later. (Monette) Student testified that the binder system did not work for him and that he still had a significant amount of loose paper in his binder and backpack. (Student) Dr. Vargo made recommendations regarding Student's organizational skills that included having somebody check in with Student at the end of each day to ensure he had recorded his assignments appropriately, understood them, and had the necessary materials. (S-19, P-19) The IEP proposed for Student in June 2003 proposed providing Student with an agenda as a written back up to Student's use of the organizational features of the assistive technology. Although Student received an agenda, there is nothing in the record to suggest that he was provided with assistive technology to assist him in maintaining his agenda. (S-11, P-20) Student's agenda was not always used appropriately. Although Ms. Monette testified that she always signed Student's agenda, the record shows that there were a number of dates when she did not sign the agenda. It is unclear how many of those days were due to Student's absence, Ms. Monette's absence, or Student losing the agenda. However, it is clear that the agenda was not always being completed by Student or signed. Parents bear some responsibility for the agenda not being the communicative device it was intended by the Team to be. Although Mother testified that Student told her that she no longer had to sign the agenda, it is unclear why she did not continue to review the agenda because the IEP specifically indicated the agenda was to be used for home-school communication.

Student's organizational needs continued to be apparent in the 2003-2004 school year. On September 11, 2003, Ms. Thompson reported Student "needs to be redirected when it comes to being organized and prepared for class." Ms. Monette and Mr. Kleindienst reported Student was missing homework assignments. The September 23, 2003 Team discussed Student's organizational difficulties and difficulty passing in homework assignments. His September 29, 2003 progress reports demonstrated that he continued to have missing homework assignments. Ms. Fino testified that she had discussed her ability to provide services in the area of organizational skills with Mr. McInerny and he testified that he did not request that she provide services in that area to Student. (Fino) Student's December 2003 progress report shows that his incomplete homework was impacting his grades. Student's first eighth grade report card contains Ms. Monette's comment "needs to work on organizational skills" and indicates he "fails to finish assignments. (P-29)

23

There is no question that Student continues to require assistance in the area of organizational skills. Although Ms. Monette recognized that Student had great difficulty in that area and testified that she had a lot of ideas that she could implement to assist him, Belchertown did not do enough to assist Student. It is unclear why Student was not provided with an opportunity to receive services in the area of organizational skills especially in light of Belchertown's knowledge that Ms. Fino had the ability to provide services in organizational skills. Although finding time in Student's schedule to provide him with necessary services has been a challenge, it is not an excuse for the Team not offering services in that area. The record shows that Belchertown was aware that Student had organizational difficulty and that it was continuing over the course of two school years. The Team should have proposed direct services in the area of organizational skills.

Student's reading disability was another major focus of the Hearing. Student has been receiving tutorials in the Phono-Graphix program since October 2003. Parents have argued that it is inappropriate to provide Student with tutorial in the area of reading decoding outside of the "regular school day." However, Student's schedule did not allow for him to receive the tutorial during his regular school day. Belchertown acted completely appropriately in offering to provide the services after regular school hours. See *In Re: Worcester Public Schools*, BSEA # 00-1912, 6 MSER 194 (2000). It was important to Student and Parents that he participate in band. Consequently, there was not a free period in Student's schedule that would allow him to receive a tutorial during regular school hours. I was not persuaded by Ms. Muzio or Parents that it was somehow inappropriate to offer tutorial services after school to allow a Student with a disability to participate in an extra-curricular activity that he enjoyed and that proved beneficial to his self-esteem.

The provision of the tutorial services has been imperfect for several reasons. First, Student has missed many sessions in order to participate in the drama club. Although it is wonderful that Student has extra-curricular interests and talents, his progress has undoubtedly been slower in the Phono-Graphix program due to the lack of continuity in services. I found Ms. Fino to be a credible witness and relied upon her testimony regarding Student's progress in the program. I find that he is making progress in the area of reading decoding. Although Ms. Muzio focussed on the fact that Student's score had not improved in the area of word attack from October until January, his score in the area of word attack had increased from 6.4 grade equivalency to a grade level, eighth grade equivalency. Ms. Fino was persuasive when she testified that Student score improvement showed that he was actually decoding words and not guessing as he previously would have. I also cannot ignore the fact that Student is now at grade level in the area of word attack after receiving just 35 sessions. Ms. Fino had worked with Student, had observed other tutors working with him, and had discussed his progress with the tutors. Her testimony that he was making progress was persuasive because she had more direct knowledge of his reading decoding skills that any of the Parents' witnesses. Ms. Monette also had direct knowledge of Student's reading ability from hearing him read in her class and in Ms. Thompson's class. She testified that Student sounded like a fluent reader. (Monette) Based on the foregoing, I find that the services being provided to Student in the Phono-Graphix program are appropriate. However, the record shows that there is not

any regular communication between the tutors who provide services to Student and anybody else at Belchertown. The record also did not contain regular progress reports from the tutor. Ms. Muzio testified that Student required carry-over from his tutoring to his academic classes. While I did not rely heavily upon Ms. Muzio's testimony for reasons that will be explained below, I was persuaded that Student would receive more benefit from his tutoring and potentially his academic classes if there was a consultation between Student's special education teacher and his Phono-Graphix tutor. It would be helpful for the special education teacher to know what area Student is learning in his tutoring so she could reinforce it during school. It would also be helpful if the special education teacher could report areas where Student was having difficulty to the tutor so she could provide additional drilling in those areas.

Parents' independent evaluator, Dr. Vargo, did not recommend an out-of-district program for Student. He did not even recommend a substantially separate program. After assessing Student and analyzing his scores, he recommended a series of modifications to assist Student. The only person who recommended an out-of-district program for Student was Ms. Muzio. Ms. Muzio testified that she reviewed limited records and observed Student in his current placement on December 2, six weeks before the Hearing. She did not do any independent testing of Student, did not write a report of her findings, and did not attend any Team meeting. She testified that she did not speak to any of Student's teachers regarding their perception of his school functioning. Throughout her testimony she made presumptions such as stating that the science lesson she observed was complicated and challenging to keep organized, without asking Student or any teacher if her presumption was correct. She criticized Ms. Piwcio for not offering what she considered appropriate support, but did not indicate what she would consider appropriate support. She criticized Ms. Piwcio for "not being a teacher" but did not explain why Student required a teacher and not a paraprofessional. Because Ms. Muzio's sole knowledge of Student and his program was based upon her review of limited records and a one day observation during which she did not ask Student's teachers questions about Student's functioning or the lessons she observed, I relied very little upon her testimony.

Ms. Monette was credible in her assessment of Student's classroom performance because she teaches him two periods per day and is available to him during his history class. Additionally, she speaks to his other teachers on a daily basis. (Monette) She testified that Student is making progress in both English and math. Ms. Thompson was also credible in her assessment of Student. She clearly enjoyed teaching Student (as did Ms. Monette). Her testimony that Student is making good progress and accessing the curriculum, even with difficult topics was convincing. (Thompson)

It was a privilege to meet Student and to hear his testimony about his school program and his many interests. His interest in his academics and his motivation were as evident as his sense of humor. His testimony showed that he seems to be aware of his strengths and weaknesses and his self-esteem does not appear to be impacted by his weaknesses. Although writing is difficult for Student, he testified that he enjoys it. He also testified that when he is bored he likes to write plays. His motivation and his many academic and

personal strengths should continue to serve him well.  Student is involved in his school community as shown by his level of participation in his academic classes, his participation in extra-curricular activities, and his testimony regarding having "good friends" in Belchertown. I cannot ignore the IDEA's requirement that

> To the maximum extent appropriate, children with disabilities, ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  20 U.S.C., Chapter 33 § 1412(5)(A).

Parents have not met their burden of showing that education within the Bechertown Public Schools is inappropriate due to the nature or severity of Student's disability. To remove Student from a school environment where he is accessing the general curriculum successfully, making academic progress, and participating in the school community would be a disservice to him and contrary to the least restrictive environment requirement of the IDEA.  20 U.S.C., Chapter 33 § 1412(5)(A).

Finally, there was a great deal of testimony regarding the IEP document that was presented to and rejected by the Parents and the document which was provided to Student's teachers.  Although it is extremely poor practice for a district to provide an erroneous copy of the IEP to staff members, (Mr. McInerny's testimony shows that errors were made in IEP while he revised it) the record does not show that Student's services were impacted by the discrepancies in the IEP Belchertown provided to Student's teachers and the June IEP that Parents rejected.  "...[P]rocedural flaws do not automatically render and IEP legally defective...Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  See *Roland M. v. Concord School Committee, et al.*, 910 F.2d 983, 994 (1ˢᵗ Cir. 1990), citing 898 F.2d at 1190, *Denton*, 895 F.2d at 979, 982, and *Burlington II*, 736 F.2d at 786.  Parents have made no such showing.  The point is made even less relevant because Parents' September 4, 2003 acceptance of the services of the IEP is silent as to whether they also accepted the goals and objectives.  Moreover, there is no indication that Student did not receive accepted services as a result of the staff's receiving an IEP that contained goals other than those discussed at the Team meeting. (S-11, P-20; S-7)

## ORDER

I find that the IEP proposed by the Belchertown Public Schools for the 2003-2004 school year was not reasonably calculated to provide Student with a free and appropriate public education in the least restrictive environment.

26